Craig M. Murphy, Esq.
California Bar No. 314526
craig@nvpilaw.com
MURPHY & MURPHY LAW OFFICES
4482 Market Street, Ste 407
Ventura, CA 93003
(805) 330-3393 Phone
(702) 369-9630 Fax
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD JACKSON, an individual,<br><br>  Plaintiff,<br><br>  v.<br><br>THOMSON INTERNATIONAL, INCORPORATED, a California Corporation; DOES ENTITIES 1-10<br><br>  Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

NOW comes Plaintiff, HOWARD JACKSON, individually, by and through his attorneys of record, Murphy & Murphy Law Offices, and alleges upon information and belief as follows:

**PARTIES**

1. Plaintiff HOWARD JACKSON resides in Spokane, Washington. Plaintiff is therefore a citizen of the state of Washington.

2. Defendant THOMSON INTERNATIONAL, INCOPORATED (hereinafter "THOMSON"), is a California corporation with its principal place of business located at 9852 Buena Vista Blvd. in Bakersfield, California. Therefore, Thomson is a citizen of the state of California. Thomson was the manufacturer, suppliers, packager, distributor, and/or seller of the adulterated food products that are the subject of this action.

3. DOES ENTITIES 1-10, are business entities whose true names and identities are unknown to Plaintiff at this time. These entities are responsible in full or in part for the growth, harvest, production, distribution, processing, preparation, contamination, and sale of the onions that were contaminated food products sold to or by Defendant to Plaintiff and caused his *Salmonella*

Newport infection. Plaintiff will ask leave of this Court to substitute the true names of said DOES ENTITIES as defendants in these proceedings when discovered.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the Defendant has certain minimum contacts with the state of California such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

5. Venue in the United States District Court for the Eastern District of California is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims and causes action occurred in this judicial district, and because the Defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## GENERAL ALLEGATIONS

### An Outbreak of *Salmonella* Associated with Thomson Red Onions

6. In 2020, CDC, public health and regulatory officials in several states, FDA, and Canada investigated a multistate outbreak of *Salmonella* Newport infections linked to onions.

7. Public health investigators used the PulseNet system to identify illnesses that were part of this outbreak. PulseNet is the national subtyping network of public health and food regulatory agency laboratories coordinated by CDC. DNA fingerprinting is performed on *Salmonella* bacteria isolated from ill people by using a standardized laboratory and data analysis method called whole genome sequencing (WGS). CDC PulseNet manages a national database of these sequences that are used to identify possible outbreaks. WGS gives investigators detailed information about the bacteria causing illness. In this investigation, WGS showed that bacteria isolated from ill people were closely related genetically. This means that people in this outbreak were likely to share a common source of infection.

8. A total of 1,127 people infected with the outbreak strain of *Salmonella* Newport were reported from 48 states.

9. Illnesses started on dates ranging from June 19, 2020, to September 11, 2020. Ill people ranged in age from less than 1 to 102 years, with a median age of 41. Fifty-eight percent of ill people were female. Of 705 ill people with information available, 167 people were hospitalized. No deaths were reported.

10. Epidemiologic and traceback evidence showed that red onions from Thomson International Inc. were the likely source of this outbreak. Other onion types (such as white, yellow, or sweet yellow) were also likely to be contaminated because the onions were grown and harvested together.

11. In interviews, ill people answered questions about the foods they ate and other exposures in the week before they became ill. Ninety-one percent of people reported eating onions or foods likely containing onions in the week before their illness started. Of the 208 people who were asked what types of onions they ate, 137 (66%) ate red onions, 130 (63%) ate white onions, and 110 (53%) ate yellow onions. Most ill people reported eating more than one type of onion.

12. FDA and states reviewed records where ill people purchased or ate onions and foods containing onions. This traceback investigation identified Thomson International Inc. as the likely source of red onions.

13. The Public Health Agency of Canada (PHAC) and The Canadian Food Inspection Agency (CFIA) also investigated an outbreak of *Salmonella* Newport infections in Canada that was related genetically by WGS to the U.S. outbreak. Their investigation identified red onions from Thomson International Inc. as the likely source of their outbreak.

14. On August 1, 2020, Thomson International Inc. recalled all red, yellow, white, and sweet yellow onions because they may have been contaminated with *Salmonella*. Other companies also recalled onions or foods made with recalled onions.

15. As of October 8, 2020, this outbreak appears to be over. The FDA released an additional report on May 13, 2021, confirming onions supplied by Thomson International Inc.—particularly those grown in the Southern San Joaquin Valley and Imperial Valley in California—as the source of 1,127 reported illnesses in the U.S. and 515 in Canada.

16. The updated FDA findings suggested multiple plausible opportunities for

contamination of implicated onion fields including irrigation water, sheep grazing on adjacent land, as well as signs of animal intrusion, such as scat and large flocks of birds which can spread contamination. Additionally, visual observations and records review of packing house practices confirmed numerous opportunities for spread of foodborne pathogens such as *Salmonella,* including signs of animal and pest intrusion as well as food contact surfaces which had not been inspected, maintained, cleaned, or sanitized as frequently as necessary to protect against the contamination of produce.

17. The FDA's investigation of the farms and fields were all conducted after the Thomson recalls, but nonetheless provided insights on several factors potentially contributing to the contamination of onions grown in Holtville (Imperial Valley) and/or Bakersfield (Southern San Joaquin Valley). Notably, while none of the samples taken post-recall tested positive for the outbreak strain of *Salmonella* Newport, several samples did test positive for other strains of *Salmonella* Newport as well as other *Salmonella* serotypes.

18. Multiple water samples collected from irrigation canals in the growing areas in Holtville tested positive for *Salmonella* Newport, and samples of irrigation water in Bakersfield also indicated the presence of *Salmonella*. The FDA investigation noted that irrigation water used to grow onions is not customarily treated before application to the field. Further, a concentrated animal feed operation was also observed to be less than a half mile form onion fields and immediately adjacent to an irrigation canal supplying water to onion crops in Bakersfield.

**The *Salmonella* Bacteria**

19. *Salmonella* is the second most common intestinal infection in the United States. More than 7,000 cases of Salmonella were confirmed in 2009; however, the majority of cases go unreported. The Centers for Disease Control and Prevention (CDC) estimates that over 1 million people in the U.S. contract *Salmonella* each year, and that an average of 20,000 hospitalizations and almost 400 deaths occur from *Salmonella* poisoning, according to a 2011 report.

20. *Salmonella* infections usually occur when a person eats food contaminated with the feces of animals or humans carrying the bacteria. Salmonella outbreaks are commonly associated with eggs, meat, and poultry, but these bacteria can also contaminate other foods, such as fruits and

- 4 -

vegetables. Foods that are most likely to contain *Salmonella* include raw or undercooked eggs, raw milk, contaminated water, and raw or undercooked meats.

21. Symptoms of *Salmonella* infection, or salmonellosis, range widely and are sometimes absent altogether. The most common symptoms include diarrhea, abdominal cramps, and fever.

22. Typical symptoms of *Salmonella* infection appear 6 to 72 hours after eating contaminated food, last for 3 to 7 days without treatment, and usually consist of: Diarrhea, abdominal cramps, fever of 100 F to 102 F, bloody diarrhea, vomiting, headache, and body aches.

23. Complications of *Salmonella* poisoning are more likely to occur among young children and people aged 65 or older. Possible complications like reactive arthritis are thought to occur in 2 to 15 percent of *Salmonella* patients. Symptoms include inflammation of the joints, eyes, or reproductive or urinary organs. On average, symptoms appear 18 days after infection. Irritable bowel syndrome (IBS) can also be a long-term complication.

24. *Salmonella* infections generally last 3 to 7 days and often do not require treatment. People with severe dehydration may need rehydration through an IV. Antibiotics are recommended for those at risk of invasive disease, including infants under three months old. Typhoid fever is treated with a 14-day course of antibiotics. Unfortunately, treatment of *Salmonella* has become more difficult as the pathogen has become more resistant to antibiotics. Finding the right antibiotic for a case of *Salmonella* is crucial to treating this bacterial infection.

**Howard Jackson's *Salmonella* Infection**

25. Plaintiff purchased and consumed a burrito from Gerardo's Mexican Restaurant in Spokane, Washington on July 5, 2020. The burrito contained onions sourced from Defendant and which were later recalled due to potential *Salmonella* contamination.

26. Plaintiff experienced symptom onset of his *Salmonella* infection in the middle of the night on or about July 5-6, 2020, including stomach pain, diarrhea, and vomiting.

27. Plaintiff's condition continued to deteriorate, and he sought professional medical treatment on July 10, 2020 at Providence Regional Medical Center in Everett, Washington.

28. Plaintiff submitted a stool sample while in the hospital which tested positive for

*Salmonella species* on July 12, 2020.

29. The Washington State Department of Health confirmed Plaintiff's stool sample as *Salmonella* Newport, and whole genome sequencing confirmed that Plaintiff was infected with the outbreak strain of *Salmonella* Newport associated with the Thomson Onions *Salmonella* outbreak (CDC ID: 2007MLJPP).

## CAUSES OF ACTION

### Strict Liability – Count I

30. Plaintiff incorporates by reference paragraphs 1 – 29 herein by reference.

31. At all times relevant hereto, the Defendant was the manufacturer, supplier, packager, distributor, and/or seller of the adulterated food products that are the subject of this action.

32. The adulterated food products that the Defendant manufactured, supplied, packaged, distributed, and/or sold were, at the time they left the Defendant's control, defective and unreasonably dangerous for their ordinary and expected use because they contained *Salmonella*, a deadly pathogen.

33. The adulterated food products that the Defendant manufactured, supplied, packaged, distributed, and/or sold were delivered to the Plaintiff without any change in their defective condition. The adulterated food products that the Defendant manufactured, supplied, packaged, distributed, and/or sold were used in the manner expected and intended, and were consumed by the Plaintiff.

34. Defendant owed a duty of care to the Plaintiff to manufacture, supply, package, distribute and/or sell food products that were not adulterated, that were fit for human consumption, that were reasonably safe in construction, and that were free of pathogenic bacteria or other substances injurious to human health. Defendant breached this duty.

35. Defendant owed a duty of care to the Plaintiff to manufacture, supply, package, distribute, and/or sell food products that were fit for human consumption and that were safe to consume to the extent contemplated by a reasonable consumer. The Defendant breached this duty.

36. Plaintiff suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food products that the Defendant

manufactured, supplied, packaged, distributed, and/or sold.

**Breach of Warranty – Count II**

37. Plaintiff incorporates by reference paragraphs 1 – 36 herein by reference.

38. Defendant is liable to the Plaintiff for breaching express and implied warranties that it made regarding the adulterated products that the Plaintiff purchased. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendant expressly warranted, through its sale of food products to the public and by the statements and conduct of its employees and agents, that the food products it prepared and sold were fit for human consumption and not otherwise adulterated or injurious to health.

39. The contaminated food products that the Defendant sold to the Plaintiff would not pass without exception in the trade and were therefore in breach of the implied warranty of merchantability.

40. The contaminated food products sold to the Plaintiff were not fit for the uses and purposes intended, *i.e.,* human consumption; these products were therefore in breach of the implied warranty of fitness for their intended use.

41. As a direct and proximate cause of the Defendant's breach of warranties, as set forth above, the Plaintiff sustained injuries, and damages in an amount to be determined at trial.

**Negligence – Count III**

42. Plaintiff incorporates by reference paragraphs 1 – 41 herein by reference.

43. The Defendant owed to the Plaintiff a duty to use reasonable care in the manufacture, supply, packaging, distribution, and sale of its food products, which duty would have prevented or eliminated the risk that the Defendant's food products would become contaminated with *Salmonella* or any other dangerous pathogen. The Defendant breached this duty and was therefore negligent.

44. Defendant had a duty to comply with all federal, state and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of its food products, but failed to do so, and was therefore negligent. The Plaintiff was among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of similar food products.

The Defendant breached this duty and was therefore negligent.

45. Defendant had a duty to properly supervise, train, and monitor its respective employees, and to ensure that its respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of similar food products. The Defendant breached this duty and was therefore negligent.

46. Defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions and that were clean, free from adulteration, and safe for human consumption. The Defendant breached this duty and was therefore negligent.

47. As a direct and proximate result of the Defendant's negligence, the Plaintiff sustained injuries and damages in an amount to be determined at trial.

### Negligence *Per Se* – Count IV

48. Plaintiff incorporates by reference paragraphs 1 – 47 herein by reference.

49. The Defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food products, including the requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301, *et seq.*).

50. Defendant breached that duty and, as a result, was negligent *per se* in its manufacture, distribution, and sale of food products adulterated with *Salmonella*, a deadly pathogen.

51. As a direct and proximate result of the negligent *per se* conduct by the Defendant, the Plaintiff sustained injury and damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a. For all of Plaintiff's economic damages, including all past and future medical expenses, as determined at the time of trial.

b. For all of Plaintiff's non-economic damages, as determined at the time of trial.

c. That the Court award Plaintiff the opportunity to amend or modify the provisions of

1 this complaint as necessary or appropriate after additional or further discovery is

2 completed in this matter, and after all appropriate parties have been served; and

3 d. That the Court award all such other and further relief as it deems necessary and

4 proper in the circumstances.

**JURY TRIAL DEMANDED**

Dated: January 5, 2022.

MURPHY & MURPHY LAW OFFICES

_____
Craig Murphy, Esq.
California Bar No. 314526
4482 Market Street, Ste 407
Ventura, CA  93003
(805) 330-3393 Phone
(702) 369-9630 Fax
Attorney for Plaintiff